CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
APR 20 2012
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA,<br><br>         *Plaintiff,*<br><br>v.<br><br>DARLENE BOWES, NORA W. ROACH, and DEVIN A. ROSE,<br><br>         *Defendants.* | No. 6:11–cv–00040<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

  Plaintiff filed a Complaint for Interpleader under Rule 22 of the Federal Rules of Civil Procedure, seeking to resolve a dispute over $15,000 in insurance policy proceeds ("the "Proceeds"), which became payable to *someone* after the death of Daniel Scott Bowes (the "Decedent"). The instant dispute turns on the validity of a Beneficiary Designation/Change Form ("Change Form") allegedly signed by Decedent on November 3, 2010, just eleven days before his death. On March 14, 2012, the Court held a bench trial, at which all interested parties offered testimony. At the conclusion of the bench trial, I gave the parties ten days to submit any additional relevant evidence. As explained below, I find that the Change Form is valid, and it lawfully changed the beneficiaries of the Proceeds.

  This case is properly within the subject matter jurisdiction of the Court under 28 U.S.C. § 1331, because the case implicates a federal question under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1144.

## I. Findings of Fact

As required by Rule 52(a) of the Federal Rules of Civil Procedure, and based on my opportunity to review exhibits, hear testimony, and assess the credibility of the witnesses at the bench trial, I make the following findings of fact:

1. Decedent was employed by Dodson Bros. Exterminating Co., Inc. and insured under The Guardian Life Insurance Company ("Guardian") group life insurance policy number G429286 (the "Policy"), which provides for a group life insurance benefit in the amount of $15,000.00.

2. Decedent elected to enroll in the Policy on August 1, 2008 and listed his wife, Darlene Bowes ("Bowes") as the primary beneficiary.

3. Decedent and Bowes had a daughter, Devin Rose ("Rose"), who is now an adult.

4. Decedent and Bowes separated in or around August of 2008, and lived apart since that time, although they never finalized a divorce.

5. While separated from Bowes, Decedent carried on a relationship with Nora W. Roach ("Roach"); they planned to one day marry.

6. On or about October 28, 2009, Decedent was diagnosed with a serious form of lung cancer and began receiving treatment.

7. On or about September 1, 2010, Decedent traveled with Roach to the Philadelphia, PA location of the Cancer Treatment Centers of America.

8. After nearly two months of treatment, on or about October 29, 2010, Decedent was released from the Philadelphia Cancer Treatment Center, and he returned home by train to Lynchburg, VA, where he was living with Roach.

9. According to physician's reports, in the days before Decedent was released from the Philadelphia Cancer Treatment Center, he was alert and oriented to person, place, and time, and

although his medical condition had brought on periods of depression and severely low energy earlier that week, his physician deemed his memory to be within normal limits and his insight and judgment to be fair. Additionally, at this time, Decedent was able to, and did, walk independently, use the restroom without assistance, and bathe himself.

10. After Decedent returned home, he was taking—or had at least been prescribed—a wide variety of supplements and medications, including 10mg tablets of Oxycodone, a narcotic painkiller.

11. Vicky Watson ("Watson"), Decedent's sister, came to visit Decedent and Roach on or about October 30, 2010, and stayed until November 5, 2010.

12. Watson testified that Decedent was very excited to see her, and very sharp during her visit. Although seriously ill, Decedent was able to carry on conversations intelligibly and cook for her.

13. During Watson's stay, on November 3, 2010, the disputed Change Form was completed.

14. Watson was present and testified that she saw Decedent sign the Change Form, although she did not sign the Change Form as a witness.

15. The Change Form names Rose and Roach as the new primary beneficiaries of the Policy, displacing Bowes. It purports to entitle Rose and Roach to 70% and 30% of the Policy Proceeds, respectively.

16. Rose came to visit Decedent on or about November 8, 2010, at which time Decedent was able to walk and speak, albeit with some difficulty.

17. As mentioned, by the time Rose arrived, the Change Form had already been filled out and Decedent's name had been signed; Rose just had to fill in her personal information in the Beneficiary Information section, which she did on or about November 9, 2010.

18.     Rose did not see who signed Decedent's name to the Change Form, and she did not discuss the Change Form with Decedent. If she harbored any suspicions about who signed the document, she did not raise those concerns to Decedent or anyone else during her stay.

19.     Decedent's condition rapidly worsened during Rose's week-long stay, and Decedent succumbed to his illness on November 14, 2010.

20.     Following Decedent's death, Guardian received a Group Life Claim Form from each Defendant. The first Claim Form was dated November 15, 2010, and completed by Bowes; the second was dated November 29, 2010, and completed by Roach; and the third was dated November 30, 2010, and completed by Rose.

21.     In the days and weeks following Decedent's death, the parties waged various legal battles against one another. Bowes contested the validity of Decedent's will (which is not directly at issue in this proceeding), and the parties disputed who should receive Decedent's ashes after he was cremated.

22.     Because of these and other ongoing disputes involving the Defendants, two separate memorial services were held for Decedent. Bowes held one, and Roach and Rose jointly held the other.

23.     Apparently believing that she would be receiving 70% of the Policy Proceeds, Rose borrowed money from Roach to pay for cost of Decedent's cremation, memorial service, and related expenses. Rose told Roach that she would be repaid once Rose received her portion of the insurance Proceeds.

24.     Pursuant to this agreement, Roach paid some $3,400.00 in attorneys' fees, which included $1,900.00 to settle a debt that Decedent's attorneys claimed that Decedent's estate owed them for prior unrelated representation, $1,500.00 for a retainer fee in anticipation of the

dispute over Decedent's remains, and certain other fees to the Lynchburg Circuit Court, Tharp Funeral Home, and the Lynchburg News & Advance. All told, these sums total $4,088.00.

25. On January 29, 2011, Guardian received correspondence from Bowes setting forth her position that Decedent was legally unable to execute the Change Form.

26. Fearing the possibility of multiple liabilities, Guardian filed this interpleader action to resolve the controversy over the Policy Proceeds.

27. On December 16, 2011, Guardian deposited $15,398.62, which included the Policy Proceeds plus then-applicable interest, with the Court's registry.

28. Having met the requirements for a Rule 22 interpleader action, Guardian has been dismissed and discharged from the case as a disinterested stakeholder. (*See* docket no. 30).

29. Guardian has requested to be reimbursed for attorneys' fees and costs, totaling $1,692.00, which it asks to be paid out of the Policy Proceeds.

30. Page 12 of the life insurance plan Guardian administers provides that:

> You [the policyholder] decide who gets the insurance if you die. You should have named your beneficiary on your enrollment form. You can change your beneficiary at any time by giving your *employer* written notice, unless you've assigned the insurance. But the change won't take effect until your *employer* gives you written confirmation of the change.[1]

31. It is unclear from the evidence now before the Court when Guardian received the Change Form and whether Decedent's employer sent him written confirmation of the change before he died. However, given that the earliest the Change Form would have been mailed is November 8, 2010, after Rose signed it, it is unlikely that Decedent's employer would have had the time to send him written confirmation of the change before November 14, 2010.

---

[1] The full document has not been submitted to the Court; merely one paragraph from page 12 is quoted in a prior motion filed by Guardian.

## II. DISCUSSION

"ERISA is silent as to any provisions regarding the change in beneficiaries. However, where ERISA is silent, federal common law applies." *SunTrust Bank v. Aetna Life Ins. Co.*, 251 F. Supp. 2d 1282, 1292 (E.D. Va. 2003) (citing *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F. 3d 554, 562 (4th Cir. 1994)). Federal common law applies in place of state law because ERISA contains one of the broadest express preemption provisions in the law. *See* 29 U.S.C. § 1144(a) ("[T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."). Thus, "the Supreme Court and the Fourth Circuit have authorized federal courts to develop federal common law of rights and obligations under ERISA-regulated plans." *Adams*, 30 F.3d at 562 (4th Cir. 1994) (citation omitted). Although the Fourth Circuit has indicated that when possible, federal common law should be "consistent across the circuits," *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1453 (4th Cir. 1992), the Court may look to state law "to guide [its] federal-common-law analysis," *Davis v. Adelphia Commc'ns Corp.*, 475 F. Supp. 2d 600, 604 (W.D. Va. 2007) (citation omitted).

In a dispute over the validity of a facially valid Change Form, the burden of persuasion must rest on the party hoping to set aside that document. Were it otherwise, ERISA administrations would be unable to safely rely on the paperwork they receive on a daily basis without undertaking a thorough and impracticable investigation. *Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1247 (10th Cir. 2001)).

The interested parties' pleadings are not detailed, and the parties did not structure the bench trial proceedings around distinct legal theories. For clarity, I have grouped the various

allegations and trial testimony into what, in my view, are the most sensible categories of legal claims.

### A. Bowes's Allegation of Fraud

In Bowes's Response to the Interpleader Complaint, she stated that "the Decedent was not capable of making any decisions on the date the Beneficiary Designation Change Form was supposedly signed, that fraud may be involved and [Roach and Rose] should have to prove [Decedent] signed the form and knew what he was doing." Bowes's Resp. ¶ 3.

In accordance with the precept that I liberally construe *pro se* pleadings, *e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), I read Bowes's Response to assert at least two varieties of fraud. First, by stating that the adverse parties "should have to prove [Decedent] signed the form," Bowes suggests Decedent actually did not sign the Change Form, and that instead, someone—presumably Roach—forged Decedent's signature. Second, by claiming that the adverse parties should have to prove that "[Decedent] knew what he was doing," Bowes suggests that Roach or Rose exerted undue influence over Decedent. (As discussed more thoroughly in Part III.A.2., *infra*, this statement can also be read to allege that Decedent was not competent, and was therefore unable to change the beneficiaries of the Policy himself).

### 1. Forgery

"It is elementary that, in the absence of a fiduciary relationship fraud is not presumed but must be established . . . ." *Bathan v. United States*, 173 F.2d 953, 954 (4th Cir. 1949). In Virginia, forgery is both "a crime and a flagrant species of fraud, [and] the burden [is] upon the [party making the charge] to prove that charge by clear and cogent evidence." *Ventro v. Clinchfield Coal Corp.*, 103 S.E.2d 254, 261 (Va. 1958) (citation omitted).

The filings and testimony demonstrate at least two non-trivial indications that the signature on the Change Form was not the Decedent's. In the end, however, these indications are insufficient to carry Bowes's burden.

First, Rose (who stands to gain financially if the Change Form is upheld) addressed the Change Form signature in a prior deposition, remarking that she did not believe the signature to be her father's. Rose Dep. 16:1–6, Aug. 25, 2011.[2] Rose states that her father's genuine signature is "nothing but a big D and a bunch of scribbles, but it comes out perfect every time he does it." Rose Dep. 16:12–18. Evidently, the signature on the Change Form does not comport with Rose's recollection of her father's signature. Tr. 38:11–12; Dep. 16:4–6. Rose stood by her deposition during her bench trial testimony before this Court. Additionally, at trial, Bowes offered various paperwork containing Decedent's signatures, and she contends that those signatures do not match that on the Change Form.

Despite Rose's and Bowes's beliefs, I observe that the signature on the Change Form does appear (at least to the untrained eye) to be similar to known exemplars of Decedent's signature. Furthermore, common sense supports the conclusion that a person like Decedent, weakened by the strains of a year-long terminal illness, might find his hand unable to reproduce an exactly typical signature. Rose's belief, therefore, does not prove a forgery. Absent the support of something like the testimony of a handwriting expert, I cannot conclude that the signature on the Change Form is not Decedent's.

Second, during her deposition, Rose testified to various malfeasance surrounding the execution of Decedent's will. Rose claimed that the first and only time she saw Decedent's will was when Roach "pulled it to print off [Roach's] computer" after Decedent had passed away.

---

[2] Rose was deposed in connection with the parties' dispute over Decedent's will.

Dep. 17:21–22; *see also* Tr. 36–37. Rose claims that to her knowledge, Decedent "had no idea about the will." Dep. 18:11–12. In her testimony before this Court, Rose reiterated that the will was done the day after her father died. Tr. 36:10–11. Moreover, Rose claims that when Roach printed the will, Rose saw Roach forge one witness's name (Kristina Burns) and Roach's son David forge the other witness's name (Chris Johnston). Tr. 36:10–19; Dep. 19:21–22. Rose further claims that Roach "called Kristina on the phone and told her 'this is what I'm going to do,' and then David also called Chris and said, 'I put your name so if anyone asks, you signed it.'" Dep. 20:4–8. If the statements Rose made in her deposition and at trial are accepted as true, then they cast Roach in a very bad light by demonstrating that Roach participated in, and indeed perhaps orchestrated, various fraudulent activities in an effort to acquire what should could from Decedent's small estate. At trial, Roach vehemently denied any suggestion that she sought to forge either Decedent's will or the Change Form.

Based only on conflicting testimony pertaining to the signatures on Decedent's will (a document that is not directly at issue in the instant proceedings), I cannot conclude that Roach also separately endeavored to forge Decedent's signature on the Change Form. Rose testified that she was *not present* on November 3, 2010, when the Change Form was signed, and she did not seek any clarification from her father about where or to whom he would like the Policy proceeds to go if he were to die. Even if I were to assume that Roach conspired to falsify Decedent's will,[3] that fact does not say anything significantly probative about the legitimacy of the Change Form. Bowes has therefore not met her burden to prove that a forgery occurred.

---

[3] I observe, without deciding, that principles of *res judicata* might make such an assumption impossible, given that the validity of the will seems to have already been litigated at the circuit court level.

9

### 2. *Undue Influence*

Undue influence, too, is a species of fraud, and it must be proved by clear and convincing evidence. *Davis*, 475 F. Supp. 2d. at 604 (citing *Friendly Ice Cream Corp. v. Beckner*, 597 S.E.2d 34, 38 (Va. 2004)). In a 2007 effort to resolve a similar dispute in another deathbed change-of-beneficiary case, I adopted the Sixth Circuit's approach to undue influence, announced in *Tinsley v. General Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000). The Sixth Circuit's *Tinsley* undue influence description proceeds as follows:

> Undue influence is generally defined as influence that is sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's inclination and free will. An individual's influence is undue when it restrains a testator from disposing of property in accordance with the testator's own wishes and judgments and substitutes the wishes or judgments of another. The undue influence must so overpower and subjugate the mind of a testator as to destroy the testator's free agency and make the testator express another's will rather than his or her own. A showing of mere motive or opportunity to exert excessive control over another is not enough to make out a claim of undue influence; rather, the influence must actually be exerted, either prior to or at the time of the execution of the relevant document. Courts have looked at a number of factors to determine whether undue influence has been exerted in a given case, including the physical and mental condition of the benefactor; whether the benefactor was given any disinterested advice with respect to the disputed transaction; the "unnaturalness" of the gift; the beneficiary's role in procuring the benefit and the beneficiary's possession of the document conferring the benefit; coercive or threatening acts on the part of the beneficiary, including efforts to restrict contact between the benefactor and his relatives; control of the benefactor's financial affairs by the beneficiary; and the nature and length of the relationship between the beneficiary and the benefactor.

*Id.* at 704–05 (internal citations and quotations omitted). As is plainly evident, the examination is "a highly fact-intensive one," and given the "subtle and often covert ways in which undue influence may be exercised, it must often be proven by means of circumstantial evidence." *Id.* at 705.

As I indicated in my findings of fact, while Decedent was no doubt weakened in his final weeks of life, he was reasonably lucid and able to conduct his own affairs up until very near the

end. Decedent's rapid, steep, and final decline in health, which affected his lucidity and mental capacity, did not occur until sometime after November 3, 2010, the date that the Change Form was signed. Furthermore, given that Decedent and Roach's relationship lasted at least two years, and Decedent's relationship with Bowes during that time seems to have been quite acrimonious, it seems reasonably "natural" for Decedent to have made Roach and Rose his beneficiaries, in lieu of his estranged wife. Although it remains unclear whether and to what extent Roach exerted control over Decedent's financial affairs, and what role Roach actually had in procuring the benefit, the other factors tend to favor a finding of no undue influence.

### B. Decedent's Competency

As mentioned above, Bowes's claim that the adverse parties should have to prove that the Decedent "knew what he was doing" can also be read to allege that Decedent was not legally competent to effect a change in the beneficiary under the Policy.

> To be capable of effecting a valid change of beneficiary a person should have clearness of mind and memory sufficient to know the nature of the property for which he is about to name a beneficiary, the nature of the act which he is about to perform, the names and identities of those who are the natural objects of his bounty; his relationship towards them, and the consequences of his act, uninfluenced by any material delusions.

*Metropolitan Life Ins. Co. v. Hall*, 9 F. Supp. 2d 560, 564 (D. Md. 1998) (quoting *Taylor v. United States*, 113 F. Supp. 143, 148 (W.D. Ark. 1953)). Here again, Bowes has the burden, since courts have "noted a federal presumption of mental capacity in the insurance context." *Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1248 (10th Cir. 2001) (collecting cases).

The statements Rose made in her deposition do support the conclusion that Decedent exhibited a great weakness of the mind in the days before his death, and Rose stood by those

11

statements at trial. For instance, Rose stated that during the week she spent with him before Decedent died, Decedent "almost acted like a five-year-old," Dep. 7: 13–14, that "[i]t was very difficult to communicate anything," Dep. 7: 14–15, that "[h]is mindset was not there," Dep. 7:18, and that "he just didn't know whether he was coming or going." Dep. 15:11–12. The deposition is replete with such descriptions of Decedent's severe physical and mental deterioration. The foregoing illustrates what was no doubt a heartbreaking final few days for Decedent's family members to be with him.

Importantly, however, Rose was only able to testify to her father's state of mind beginning with her arrival on November 8, 2010, some five days after Decedent is purported to have signed the Change Form. Decedent's physicians, his sister, Roach, and Roach's son all indicate that Decedent was quite competent immediately after his release from the Philadelphia Cancer Treatment Center. All parties agree that Decedent deteriorated in the time between his release and his death two weeks later, but Bowes has not met her burden to show that Decedent lacked the capacity to execute the Change Form on November 3, 2010.

### C. Compliance with the Plan's Terms

As illustrated in my findings of fact, the terms of the Plan indicate that a change in beneficiary does not take effect until the policyholder's employer gives written notice confirming the change, but I find that even if Decedent's employer did not give the required written notice, the doctrine of substantial compliance gives legal effect to the Change Form.

The concept of substantial compliance is another tenet of federal common law applicable to the instant case. A party seeking to prove compliance with the terms of a plan can show substantial compliance by demonstrating that "the insured: '(1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which

12

is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.'" *Adams*, 30 F. 3d at 564. Although "[s]ubstantial compliance is less than actual compliance, . . . [the] rule . . . give[s] effect to the insured's intent when that intent is clear." *Id.* at 565.

In *Adams*, the Fourth Circuit deemed the decedent employee to have substantially complied with his plan's requirements in changing his designated beneficiary where the form he submitted was the correct form, albeit incomplete, and then followed-up with his insurance provider, which failed to give effect to the change. *Id.* at 564–65. In *Steamship Trade Ass'n Int'l Longshoremen's Ass'n , (AFL-CIO) Benefits Trust Fund, (AFL-CIO) v. Bowman*, 247 F.3d 181, 184 n.\* (4th Cir. 2001), the court determined that the decedent employee's completion of a *form for death benefits*, which named his wife as beneficiary, was not substantial compliance because under the pertinent plan, the employee had to complete *a change of beneficiary form*. In short, the purposes of the two forms were different, and the wife could not show substantial compliance. *Id.* And in *SunTrust Bank v. Aetna Life Ins. Co.*, 251 F. Supp. 2d 1282, 1293 (E.D. Va. 2003), the court, in analogizing the decedent's efforts to those of the decedent in *Steamship Trade Association*, found a lack of substantial compliance because neither of the documents the decedent signed "indicated that [the decedent] was attempting to change the beneficiary of the policy . . . ."

Turning to the Change Form at issue, I find that it substantially complies with the Plan's requirements. After all, assuming that the Decedent's signature on the Change Form is genuine, he indeed did just about all that was required *of him* to change the beneficiaries of the Policy. All that was left was to mail the form and for his employer to send a confirmatory notice that the

change took effect.[4] Decedent did not, and could not, mail the form himself after signing it, because he had to wait for Rose to fill in her personal information. By the time Rose did so, Decedent's condition had worsened, and for whatever reason, and perhaps at Decedent's direction, Roach mailed the form herself.

### D. Roach's Cross-Claim against Rose

In her Response, Roach states that "[b]ecause [D]efendant Rose had no money to take care of her fathers [sic] funeral, I, Nora Roach, loaned her approximately $4088 until the insurance money was processed." It appearing that Ms. Roach's allegation arises out of the same general case or controversy that gave rise to the original Interpleader Complaint, I deem her allegation a cross-claim over which I will exercise the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

Rose admitted at trial that she promised Roach that once she (Rose) got her share of the insurance Proceeds, she would pay Roach back for the funds Roach advanced to defray the costs associated with Decedent's death. Rose did not dispute the accuracy of the amount Roach claimed. Even if I find that Rose's promise to pay was conditioned upon Rose receiving the insurance money, that conditions will be satisfied after judgment is entered in this case. I therefore conclude that Rose must repay Roach the sum of $4,088.00.

---

[4] The foregoing assumes that the Plan does not contain *other provisions* that would allow the Change Form to take effect after Decedent's death, if he were to die (as he indeed did) prior to his employer sending the confirmatory notice. The parties have not provided any further such provisions, and I rely on what is now before the Court.

### E. Attorneys' Fees and Costs

As previously noted, Guardian has moved for an award of attorneys' fees and costs. The interested parties have not objected to Guardian's request, and I will award fees accordingly; such fees will be paid out of the funds already on deposit with the Court.

### III. CONCLUSIONS OF LAW

Whether anyone forged Decedent's signature is a question of fact that must be proved by clear and cogent evidence. I have not found such evidence to exist. Whether anyone exercised undue influence over Decedent is a fact-intensive inquiry, and I have found that the evidence to support such a conclusion has not been offered. From the evidence I have seen, Decedent was competent to lawfully execute the Change Form. Finally, the doctrine of substantial compliance serves to validate the Change Form despite it appearing to be true that Decedent did not receive written confirmation from his employer that it had received the Change Form. I therefore find the Change Form to be valid. Moreover, pursuant to their agreement, Rose shall be required to reimburse Roach $4,088.00, which represents the money that Roach remunerated for expenses relating to Decedent's memorial service and the attendant legal battle over his remains. Finally, Guardian shall be due $1,692.00 in legal fees.

In the accompanying Judgment Order, I detail the way in which these various funds are to be withdrawn from the Proceeds now on deposit with the Court's registry.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion and accompanying Judgment Order to all parties of record, and to Plaintiff's counsel.

Entered this 20th day of April, 2012.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE